May it please the court. Good morning. I'm Steven Holbrook, representing the appellants. Fairfax County has about 24,000 acres of parkland, public parkland. It entails 335 or so miles of pathways, and it constitutes almost 10% of the county. Fairfax County saw fit to ban mere possession of firearms throughout all the public parklands, and also in places that require a permit for a public gathering but don't have a permit, and in adjacent places to those places. So you raise a facial challenge here. Yes, we do, Your Honor. All right. So the distinction from the prior case, which I'm sure you were listening to with regard to parks is, as I understand the record here, the county operates three preschools in county parks, and if the school restriction the Supreme Court cited several times applies, why wouldn't that in and of itself end a facial challenge with regard to parks? Because the park ban is separate from the school issue in the sense that it's already illegal. But there are schools in the parks, apparently. That's my point. Firearms are banned in those places because they're schools separately, and the ordinance cannot be so broad, though, that it would encompass these tiny places. We're talking about mostly wooded areas, and the county would be free, actually would be redundant to pass a ban on guns in those small places. I understand that argument, and it may very well be a valid as applied argument. But from a facial standpoint, when you're challenging parks in Toto, if there are places in the parks where the banning of firearms is appropriate under the Supreme Court's rulings, that's where it seems to me there's a real problem and a facial challenge because the courts adopted the Salerno principle in terms of Second Amendment facial challenges. There's two different kinds of approaches we can take to this issue of whether something is valid or invalid in all circumstances, Salerno and Rahimi. And to speak to the Rahimi situation, for example, you have founding era precedent, namely the going arm statutes that justified banning possession of guns by people who are found to be dangerous and found to be a credible threat to another person. The same with Salerno. That was a mob case involving the Bail Reform Act. And so we're talking about people, not a substantial area of constitutionally protected conduct. But if we contrast that approach with, for example, Bruin, there are plenty of sensitive places in Manhattan. But like the court said, you can't ban firearms throughout all of Manhattan. I like to think of the example of the Thurgood Marshall United States Judicial Center. I've argued cases there. And beside that is the New York County Judicial Center. Those are sensitive places, not to mention all the schools throughout New York City, Manhattan specifically. But you can't ban guns in all the entire jurisdiction of Manhattan. So I think you can certainly ban guns in places that are sensitive places. And that's why, as I said, it's already illegal to have guns in those school properties that are within the boundaries of the park. But we're talking about mostly wooded areas. And the fact that our plaintiffs are people with Virginia, Commonwealth of Virginia issued concealed weapon permits, they go in these mostly wooded areas. There's no protection. And if that's a sensitive place, then there's no end to sensitive places. So what I'd like to turn to is, first of all, we start with the Bruin standard. There's a presumption that if something is encompassed within the plain text of the Second Amendment, that it's protected. And that's what we're dealing with here, the right to keep and bear arms. And it's up to the county to find analogs from the founding period. What the county has done is to depend primarily on the Second Circuit Antonyuk case. And they try to argue that Virginia and North Carolina had analogs to banning mere possession of guns in certain places. So the Virginia statute, however, this is from, I think, 1786, provided that going or riding armed... The Supreme Court refused cert, I believe, in that Second Circuit case, didn't it? There's an Antonyuk 2 case now. What the Supreme Court did was to grant cert, vacate, and remand for further consideration in light of Bruin. I'm sorry, in light of Rahimi. And so the Second Circuit did that, and I'm going to call it Antonyuk 2. It adopted exactly the same reasoning as before. And they didn't file cert? The status of that case now, I'm not sure of. I think there may be a cert petition pending in that. All right, well, we can find that. Can I ask you about the expert affidavit or declaration of Professor Cornell that talks about the history of parks and the notion that parks at the founding weren't really parks as we think of them today, or even when parks became a broad aspect of our culture and society, and that, at least from the founding of parks in the sense of which we describe them today, that weapons were always banned. Why isn't that enough to support the ban in this case? Well, first of all, there's always been green or common places where people did things like contemplate nature, and children played, and there was Boston Common from the 1600s, there was the National Mall in Washington. Right, but I guess the evidence of record suggests that that was more of a place where militia were to be found, where weapons were stored, where cattle grazed, but not the kind of place that we think about in today's society or in the late 19th century that we think about when we think about parks. What Professor Young said is this romantic idea of contemplating nature somehow made these places very different. If we want to start with Central Park in 1858, it was enclosed. You had to go through certain gateways to go in. There was security there. It was quite different than vast park lands, and it seems incredible to think that the vast areas where people could recreate and where we've documented in the record that people did a lot of the same things that you do in parks today, it just baffles the mind that there's some kind of revolution in doing away with Second Amendment rights in these places. Professor Young over the county, they've not identified any specific security threat that people have in places where there's a romantic idea of contemplating nature, and humans are the same. Whether we might have enhanced parks, but before we had Central Park and New York, we had other places where people would recreate, and just because they did militia activities there or maybe grazed some cattle didn't make any difference. Also, as the county piles up these ordinances and makes it look like a big quantity, there was only Central Park before the Civil War, and then I think Philadelphia might have been 1868, and that too also, I don't know. Then we move on to going into the latter part of the 19th century and then into the 20th century. These are the examples that the county gives, but that's too late. You've had the discussion a few minutes ago about 1791 versus 1868. It's our position that 1791 governs. You've got the fact that all of these federal cases that were decided involving the federal government and the application of Bill of Rights guarantees to the federal government, you can imagine the mess it's going to be if suddenly 1868 is the standard that we go by to evaluate restrictions that the federal government might make. My colleagues actually make that argument in their brief that 1868 would be the year or the public understanding date that you would look at for even federal restrictions. I think it's impossible to think that you're going to have one standard for the feds and another one for the states. What the court has said consistently in Heller, Bruin, and Rahimi is that we look at the original public understanding and for later precedents, analogs I should say, we look at what is consistent with that earlier understanding. Getting back to the analogs, if I could return to the two cited, Virginia and North Carolina, that court was just simply wrong about them. Virginia, 1786, made it a crime to go or ride armed in markets, fairs, and other places in the terror of the country. There was the terror element that had to be proven. In North Carolina, in 1741 and again in 1791, there was a statute providing that constables had to arrest people who would go armed offensively. In both of those statutes, they also said that as far as slaves go, if they go armed at all, that was a crime. You can see a clear distinction between going armed offensively and going armed at all. Yet the county tries to argue, they don't even recognize those two laws were on the books. They instead want to use a privately published compilation of English statutes that were passed by parliament that the author claimed were enforced in the states. The collection by Francois Xavier Martin, a collection of statutes to the British parliament, that was never a law passed by... I'm sorry to interrupt, but that's the problem with this whole exercise is whose history do we accept? You've just gone through a summary of why you think a historical record is somehow different from what the other side suggests. It's just clear to me how we're supposed to figure that out. Well, because in the case of North Carolina, we have what the legislature actually passed in 1741 and then in 1791 versus this private publication that Antonyuk II claims was the law in North Carolina. All it was was a reprint of the statute of Northampton that the Supreme... Actually, if you go back to precedents, and Bruin talks about these English precedents, that was never interpreted to mean that going armed per se peacefully was an offense. In fact, what the court said, the common law offense was simply to go armed in a manner with to terrorize other people with dangerous and unusual weapons. And so, again, if we're talking about the county, we have the fact that these are large forested tracts of land throughout the county. If you go on these trails, you could be... Our lead plaintiff, Ms. Lafave, is a single female. She's walking on the paths by herself. There's no security out there. And I don't need to go into... There's been crimes committed in these park areas. But as far as the need for self-defense, I think Judge Gregory's comments in the previous panel are highly relevant here. What's a person to do? Anybody can go out there with a concealed weapon. You can't restrict that. And for the county to make it a misdemeanor for a bad person to go wait for somebody to potentially attack a person for rape or robbery or whatever the case may be, and to say that person needs no security, but the bad guy will be deterred by this misdemeanor prohibition, I think it's just so totally unrealistic. But I think the bottom line is not the policy arguments. I think the bottom line is what Bruin has set forth in terms of there's a presumptive right to bear arms. There's got to be some kind of overcoming of that presumption by the government. And in this case, they failed to do that. There's no historical analogs. And even if we want to start with the two late purported analogs that they talk about, there's not enough of them. We have one city before the Civil War, and then we have the increasing number of local jurisdictions adopting park restrictions. And bear in mind, again, that these parks were enclosed, and they had doorways, and they had so-called keepers. That's in Dr. Young's affidavit, the people who provided security. And so those precedents just are not like the parks today. And so we think that the court should look at this case in terms of here we have these huge wooded areas, and if you can ban guns in those, and if that's a sensitive place, there's really no end to this. So I see my time is up unless there's a further question. Thank you, Mr. Holbrook.  Ms. Carter. Good morning, and may it please the court. I'm Janet Carter, representing defendants. This court should reject plaintiffs' facial challenge to Fairfax County's restrictions on guns in county parks and at county permitted events. Their facial challenge to the parks restriction fails because banning guns from parks is consistent with historical principles, and in fact precisely matches well over 170 historical laws from all across the country. And just like the other sensitive places laws that Bruin recognized as consistent with the Second Amendment, there have been no disputes regarding the lawfulness of banning guns from parks historically. No treatises, no case law, no commentary suggesting that these laws were ever considered to be unconstitutional. So, but what do you have before 1868? So we've identified three strands of historical laws, and I can go through those in turn. The first are prohibitions on guns in schools, and going to your point earlier, Judge Agee, about this being a facial challenge, the many small playground parks in Fairfax County are ones where guns can obviously be banned by analogy to the constitutionality of prohibiting guns in schools. Now, my colleagues in this case, they haven't challenged that. Your colleague makes the point that, you know, you take the preschools out of it, you know, most of the park area is, you know, wooded area. I mean, it's not a playground or anything like that. I mean, so if the schools weren't involved in this, why would you prevail? I'm not referring, although that is also an important part of this case, is that there are these preschools in the parks. Let's just assume the schools weren't there. Yes, I'll put those aside. There are parks that are just a playground. Farrington Park, it's not much larger than this courtroom, it's just a playground. Clemerjantry Park, it was designed for kids with special needs. There are a large number of small playground parks, and plaintiffs' position, because they have chosen to bring a facial challenge, what they need to prove is that this law is unconstitutional in all of its applications. That's what the Supreme Court said in Rahimi. And there are these numerous applications where the law is clearly constitutional. So they can bring an as-applied challenge if they want to challenge the more remote parks, but that's not what they chose to do. And I want to be very clear. We have assembled a historical record that establishes that the county's regulation is constitutional in all of its parks, because not only have guns been prohibited from urban parks, they've also been prohibited from state and national parks. Again, with no disputes as to the constitutionality of those prohibitions. Well, you know, the discussion seems to have been sort of limited in the historical analysis to Boston Commons and the Washington Mall, but there were lots of other green spaces in the founding. I mean, there were at least three in Colonial Williamsburg. You can see them today at Hampstead Mall and Charleston, and there's no evidence that there were any restrictions on firearms in any of those places. So this is an important question that also came up in the last argument about historical silence. I want to answer the first part of your question first, which is about whether those early green spaces are properly considered parks. We have uncontested evidence from our expert witness, Professor Young, that parks at the founding, sorry, that those early green spaces at the founding, they were set aside for utilitarian purposes. They were shared grazing pastures or dumps, or they were used for militia training. They were completely different. Well, the militia might have trained once a month, but are you going to tell me that all the people in Charleston, South Carolina who went for strolls in the Hampstead Mall in the founding area were prohibited? So this gets to the second part of the question, but I do want to underscore that the record here is uncontested and both Wilford and Antonyoke held, and to your question about Antonyoke's, it has been denied from that second iteration of the petition in Antonyoke. Both of them found that the parks did not emerge until the middle of the 19th century. But even if you disagree with me about that, that doesn't mean that the absence of regulation at the founding rendered regulation unconstitutional. This has been made clear. It is a fundamental premise of federalism that governments don't regulate to the constitutional limit. Governments are allowed to experiment with regulation within constitutional bounds. We saw in Rahimi that the Supreme Court gave no weight to the fact that even though domestic violence has existed since well before the founding, and even though there were no laws specifically disarming domestic abuses at the founding, it gave no weight to that fact in its analysis, and in fact, had no trouble concluding that the law that was challenged there was constitutional. The Supreme Court in Dobbs, the day after it did it. Well, they didn't do that in a vacuum. I mean, they did it because of the rotting and terror of the people laws. In Rahimi? Right. Yes. So the court drew together two strands of laws that were quite distinct from the one that was challenged. As Judge Rushing's concurrence in the judgment, I think, in the Maryland Shell issue case made clear, there was an enormous, and indeed, Justice Thomas's dissent in Rahimi made clear, there was a very large distance between the law that was challenged in Rahimi and the analogs that they relied on as sufficient. And so, again, the question that this goes to is the fact that silence on the particular question at the founding is not dispositive. So even if I were to grant that those early green spaces were parks, again, contrary to the record and contrary to Antony and Wilford, nevertheless, all of these sources, and there are more, so Dobbs decided the day after Bruin, said the fact that many states didn't prohibit pre-quickening abortions in the 18th and 19th century didn't mean that anyone thought that they lacked the authority to do so. Sorry to interrupt, Ms. Carter, but I understood your colleague's argument on the other side to be not that there was legislative silence, but that to the extent that the founding era legislated, there were restrictions, but they were limited, as Judge Agee described, to people riding to the terror of the populace. And therefore, that's sort of the history that we look at, not silence, but the specific limitations that were in place at the time. So that is a regulation that existed as to carrying guns anywhere. That part of the statute of Northampton is not about sensitive places. Northampton and Northampton style laws from the early American states did two things separately. They prohibited guns in particular places, in front of the king's justices in Northampton or in front of the justices, i.e. in courts, excuse me. Thank God for that. And also in fairs and markets. And then they also prohibited guns elsewhere. And it was that second part that had the terror requirement. Elsewhere? Anywhere. So if you carry guns anywhere to the terror of the people, that was prohibited. That's what Bruin said. The Supreme Court in Bruin said, you know, that the statute of Northampton, to the extent that it would make a per se possession in a fair or market precedential, had no application come 1791. I mean, they're pretty clear on that. And so what they've used is solely to a certain extent, surety laws, which really didn't disarm anybody, or these riding to the terror laws. That's what the Virginia and the disputed North Carolina statute were about, were riding to the terror, not a per se possession of a weapon. So I think that the Second Circuit in Antioch was correct about this, that Bruin has not decided anything about the parts of both the statute of Northampton. But I think more importantly, as my colleague from Maryland said, the early American laws observed in North Carolina and Virginia, they haven't said anything about the part that's about the specific carry locations, fairs and markets, and courthouses, everything. They probably didn't need to, because that hadn't been the law for 300 years. I mean, ever since Sir John Knight's case, 1686, you know, you had to have, you had to be riding to the terror of the people. Well, again, that's elsewhere, the colonial law. So Virginia's law specifically, Bruin specifically discussed. I don't believe that that Bruin discussed the Virginia iteration of it, particularly as it applied to these particular locations. I would like to get to a number of other arguments that we've heard. One of them was the question that you asked Judge Agee in the previous argument about 1791 versus 1868. Now, this court, we submit should just look at all of the history across time as it has done in Bianchi, and as the Supreme Court did in Heller and in Bruin. But if it decides that it wants to address this question of 1791 and 1868, I just do want to make sure we're clear on just how strong the arguments are for 1868. This is what leading proponents of originalism have said is the correct answer in cases against a state or local government, as this case is, and the Maryland case is. Because the question that an originalist is answering is how did the people understand the right at the time that they adopted it? And the right to keep and bear arms was only adopted as a constraint on the state in 1868. So many leading commentators in academia have said that. It's also the position that Justice Thomas took in a dissenting opinion in Mahanoy Area School District. He said, in that First Amendment case, I would begin the assessment of the scope of free speech rights incorporated against the states by looking to what ordinary citizens at the time of the 14th Amendment's ratification would have understood the right to encompass. Justice Scalia said something similar in a case called McIntyre from 1995. And even the NRA's lawyer in Bruin was asked this question by Justice Thomas, should I look at 1868 and Reconstruction or should I look at 1791 and the founding era? And he said, if the case arose in the states, I would think there'd be a decent argument for looking at the history at the time of Reconstruction and giving preference to that over the founding. So all of these... Third Circuit didn't seem to buy that argument in Lara. Is that wrong? We do disagree with Lara. That's also distinguishable because, unlike in this case, there is positive law in the founding era that the court considered to be in conflict with the later law. Here, what we have is no regulation at the founding. And I've told you all the reasons why no regulation of carrying guns in early green spaces shouldn't be considered an indication that anyone thought that that was unconstitutional. As Justice Barrett said in her concurrence... There wasn't any regulation in the founding era as to, I mean, and obviously the Supreme Court's going to have to figure this out, as to the 18-year-olds carrying firearms. There wasn't any regulation for that. Most of them had to show up for militia service and bring their own weapon. And I guess you could deduce from that that there wasn't a regulation because you could also argue, well, the only place they could carry the firearm was to their militia duty. The Third Circuit understood those early militia laws to be establishing not only a duty, but implicitly a right. Because if they had to show up at militia duty with a gun, and given the militia context of the Second Amendment, they considered that to establish some right. We disagree with that. But that's how the Third Circuit got to the conclusion, I believe, that there was positive law at the founding, establishing a right for people in that age group to carry. We don't have anything like that. Again, Justice Barrett in her concurrence in Rahimi said, it would be a serious mistake to say that historical silence had that kind of implication, because governments don't regulate to the constitutional limit. They don't have what you described as a use it or lose it approach to regulation. I want to also speak to the question that Judge Gregory asked about going to this government security argument. And I want to quote from the en banc decision in Bianchi. I realize that two members of this panel didn't join that majority opinion, but nevertheless, it is the en banc decision. I'm quoting, another limitation from Bruin involves where arms can be carried, laws forbidding the firearms in sensitive places such as schools and government buildings are permissible, quoting Heller. Continuing the quote, again, citizens in those places have no less of a right to protect themselves. But our society has deemed that giving people the capacity to use large amounts of force at a moment's notice in a sensitive place is not worth the danger that they will unlawfully depose deploy such force against innocent civilians or public figures there. So this speaks, I think, to the fact that the government security argument that is somewhat advanced in this case, and much more advanced in the Kipke case, is completely incompatible with what the Supreme Court has said about sensitive places. Government buildings today routinely lack security, schools routinely lack security, polling places do. It's absolutely clear that the Supreme Court thinks it's permissible today to ban guns in polling places. But my friends arguing for the Kipke plaintiffs are saying that the government can't do that unless they comprehensively secure a polling place, as if it was the entry to an airport. Several states actually prohibit that because of concerns about voter intimidation. You can't have that kind of security at a polling place. And so it's impossible to reconcile that argument with what the Supreme Court has said. Well, if you accept the premise that the Supreme Court has just put schools and government buildings as categories, they're off limits to guns, end of discussion. How does that help you with any of your, because they're identified by name, and there's no, as I think our questions have illustrated all morning, there's no real principle that flows from that, that's clearly identifiable. You got schools, you got government buildings. How does that help you with your arguments? So I disagree that there's no principle that flows from those with respect to schools. I think what's going on there is a recognition that there's a principle that you can prohibit guns to protect a vulnerable population, specifically children. When you have a playground park, a small area that's just a playground, the exact same interests are in play. But nevertheless, I think a very important fact here is that the Supreme Court was very clear that it was not setting out an exclusive list. It said, for example, both in Heller and then in Bruin when it set out its sensitive places, discussions in both. And we have now gone and found well over 150 historical laws specifically prohibiting guns in parks. What those decisions were asking for was that historical analysis. Either you can reason by analogy from places that the court has already identified, or you can go out and find historical laws. So even if there were any doubt about the analogies that can be drawn from the places that the Supreme Court has already identified, there's no doubt that prohibiting guns in parks has been considered constitutional from when those parks first emerged in this country until today. Again, with no earlier conflicting evidence and at no point in history, any indication that anyone considered those laws to be unconstitutional. What about the events? That's pretty broad, isn't it? So it's not broad. And thank you for that question. It's not broad because of how it operates in Fairfax County. It only applies when there is a county issued permit. This is something that plaintiffs briefing repeatedly omits. It has to be a county issued permit and because the county doesn't own its streets. No, no, but it doesn't. It says broader than that. It says it applies to any place whatsoever in nature that's open to the public and being used by or adjacent to a permitted event or an event that would otherwise require a permit. So it's beyond permitted. It's anyone that would require one. For example, what I'm saying in Hypo is this. Let's say you're minding your business with a handgun as you have a right to do under Heller and brewing. And in your neighborhood, 100 people decide to get a soapbox and get in the middle of the street and want to talk about any subject they want to talk about. Under this, I read this and you tell me if I'm wrong, that that's an event that you would otherwise need a permit because I don't think you have to you allowed to block the street without a permit. Are you on you follow my hypothetical? Are you allowed to block the streets without a permit? Without a county permit, the county permit has nothing to say about that. And I think you're reading from the plaintiff's brief, which omitted the word county when it set out the ordinance, it has to be a county permit permit for the ordinance to apply. So it doesn't say would otherwise require permit, excuse me, or otherwise required require permit. Yes, if if otherwise require a county issued permit. Now, what you're describing county in there, because then otherwise, so, so anything that otherwise would require one. So my point is, is broader than just a permitted event. Yes. Just to be clear, that's right. This Yes, the language is in there. So that if somebody as in your hypothetical, should have got a permit, but didn't write, the police could still show up with movable signs, put those signs out. And at that point, only after the signs are there, only at that point, does the ordinance become enforceable? But that doesn't matter that notice doesn't take away the stench of limiting the right. That's like saying, Well, I have to say, may you would you please move? Or would you please? That doesn't matter. You're still you're still prohibiting someone from carrying a gun. You think that it cleans it up because the police have to say, you know, it's permitted place here. And you need to leave and please go if you don't, I'm going to arrest you if you have a weapon. So but that that could pop up anywhere in the county, correct? No, it cannot, it can only pop up in the places where the county issues permits for and that is not on county streets. Because the dot can I read it wrong? Is there any place that's open to the public? And there's no place open in the public and where either a county issued permit has been granted, or a county issued permit should have been sought only in those two circumstances. Well, well, what part of the county that they don't cover for permitting? So this is set out on a website as the undisputed record. I mean, for example, what part? But sure. Okay, so there's the government center in Fairfax County Government Center. That's where almost all of these permits are issued for. It's the forecourt of a building. And that's where most protests and other kind of lobbying type meetings take place. So people go get permits there for to have an event there. Once they have those permits, the signs go up. And at that point, with the signage there, this prohibition All the other places in the county, you could block the street and do what you want to do because that's not the ones you listed. If you do that, you're you've got a problem with VDOT with the transportation, not with the county, because VDOT are the ones that administer the roads, not the county. That's right. Not to get in. I'm sorry. Go ahead. Not to get in the weeds too deeply. But if you moved over to the city of Alexandria, where the streets are controlled by the city, not by VDOT, then it seems like you would have a circumstance where the ordinance under your theory would be valid in Fairfax County, but invalid in Alexandria. Well, you know, we're just representing the Fairfax. I don't know the extent to which I know that that or I believe that the city of Alexandria adopted some similar vision of the ordinance. I don't know that. I don't know the language of their ordinance and how they apply it and how they apply, for example, their own notice requirement. I see I'm well out of time, but I'm happy to answer any other questions. Thank you, Miss Carter. Mr. Hallbrook. Thank you, Your Honor. One part of Bruin that the county attempts to rely on where there's no analog that seems to be proper, at least from the right time period, is unprecedented societal concerns. And I'd like to know what is the unprecedented societal concern about law-abiding peaceful, peacefully carrying concealed weapons with having permits for them, hiking in the woods. What are the unprecedented societal concerns? After thinking about that language, a good analogy that came to mind would be, if you remember back in the 60s, we started having hijackings of planes. And before that, hunters would actually bring their gun cases and put them in the hold, you know, where they store coats even today. But because of the hijackings, it became unlawful to carry a gun into the sterile area and on board, and you have to check the gun if you're going on a hunting trip, for example. And I would think that's a good example of an unprecedented societal concern where you can justify and you can find, I'm sure, analogs to that, whatever they may be. There's been no discussion here about that, but that's a good example of an unprecedented societal concern. Well, isn't the remedy then for that hiker in the isolated woods to bring that challenge as applied? Ms. Carter mentions that this is a racial challenge, and she listed a bunch of parks where clearly the interests are different. So why doesn't your claim fail at that step? We don't think that this ordinance, merely because it bans all firearms in all public parks in the county, is the proper way to enforce prohibitions on schools, the tiny portion of parks that might have a school in them. No, no, no. She mentioned a bunch of parks that... She mentioned one that was for special needs children and parks that are the size of this courtroom that were... Obviously, the interests are a bit different than the hiker moseying along in the woods by himself or herself. I mean, that seems like a challenge for another day. So our position on that would be that if they think that's a sensitive place, any places they think would be sensitive places there within these county parks, they need to find a way to establish a general rule that would be applicable to these places and ban guns there, if they can justify those as being sensitive places. But what they've done is equivalent to... And by the way, the Fairfax County Park System is twice the size of Manhattan, the total island of Manhattan. And the Supreme Court in Bruin says that you cannot ban guns in all of Manhattan, even though there are playgrounds in their schools and there's courts there. And that was a proper challenge. It was brought by two individuals, and yet the court didn't just say that the New York law was invalid as to these two plaintiffs. They said this law is invalid. And so I think that's the same approach we take here. But by contrast, with Rahimi, there were analogs like the going arm to the tear of the people statutes that the court found good analogs for banning possession of a firearm by a person found by a court to be a danger, a credible danger to the physical safety of another person. And if I could just say one more thing about the 1791 versus 1868 issue, what Justice Thomas said in Bruin was that we've always assumed that the original public understanding from 1791 is proper. And he added that, well, yeah, there's a scholarly debate about whether that's appropriate. And he cited an article by Akhil Amar and one other professor. But what the court said before that sentence was we've always assumed. And so it's not for us to come before the court, and it's not for this court to say what the Supreme Court has always assumed is incorrect. I mean, the court's going to have to make a final ruling on that if it deems it necessary. But all the case law on, you know, First Amendment, Fourth and Fifth and all the rest, they've always gone by the original public understanding from 1791. And so for us to go against what the Supreme Court has said, we've always assumed something. That's their assumption. They're going to keep assuming that until they change that. Thank you very much, Mr. Halpern. Thank you. I want to thank both counsel for their, all the counsel for their fine arguments in the Second Amendment cases, which are, as ever, quite perplexing. We'll come down and greet you adjourned for the morning.
judges: Albert Diaz, Roger L. Gregory, G. Steven Agee